**Bob Allen BLOEMKER,
Appellant–Plaintiff,**

v.

**DETROIT DIESEL CORPORATION, PTI Industries, Incorporated, and North Manchester Foundry, Inc., Appellees–Defendants.**

No. 85A02–9901–CV–19.

Court of Appeals of Indiana.

Dec. 20, 1999.

Harry A. Wilson, Jr., Wilson Kehoe & Winingham, John A. Payton, Lehman Payton, Indianapolis, Indiana, Attorneys for Appellant.

Sydney L. Steele, Jon K. Stowell, Lowe Gray Steele & Darko, LLP, Indianapolis, Indiana, Edward L. Murphy, Jr., Tina M. Yordy, Miller Carson Boxberger & Murphy LLP, Fort Wayne, Indiana, Attorneys for Appellees.

## OPINION

RILEY, Judge

### STATEMENT OF THE CASE [1]

Plaintiff–Appellant Bob Allen Bloemker (Bloemker) appeals the trial court's entry of summary judgment in favor of Detroit Diesel Corporation (Detroit Diesel) and North Manchester Foundry, Inc. (North Manchester) on Bloemker's negligence claim.[2]

We affirm.

---

1. Oral Argument was held on this case on November 10, 1999.

2. We would like to clarify at the outset of our discussion that our holding in this case is to be narrowly construed to the facts and circumstances surrounding this particular case.

Therefore, we do not wish for our decision in this case to be construed as holding that there are no alternative facts and circumstances under which Detroit Diesel or North Manchester could be found to be suppliers.

## ISSUE

Bloemker raises several issues for our review, one of which we find dispositive of the issues in this case, and restate as follows:

Whether Detroit Diesel and North Manchester were suppliers under either section 388 or 392 of the Restatement (Second) of Torts which impose a duty upon those who supply chattels to others.

## FACTS AND PROCEDURAL HISTORY

Because a decision has already been rendered in this case by this court on different issues, we find the facts as outlined in that case to be controlling in this case as well. *Bloemker v. Detroit Diesel Corp.*, 655 N.E.2d 117 (Ind.Ct.App.1995), *trans. granted.*

Bloemker is an experienced journeyman pattern maker employed by Allen Pattern Works in Fort Wayne, Indiana. A pattern is a master model used to make a mold into which molten iron is poured to form a casting. On September 19, 1990, Bloemker was making two modifications to a particular pattern as directed by his employer. In order to make the modifications, Bloemker heated the pattern. During the heating process, the pattern exploded. Bloemker was injured, losing his right arm.

A post-explosion inspection revealed that the pattern had a sealed cavity that contained a mixture of sand and moisture. When Bloemker heated the pattern, the mixture expanded, resulting in the explosion. Core material such as sand and moisture is typically removed from pattern cavities. The pattern in question, however, contained only one vent hole which was inadequate to remove the core material. Patterns with cavities of the size involved here normally have more than one vent hole or access point.

Detroit Diesel owned the pattern that injured Bloemker. Prior to the incident involving Bloemker, the pattern was used to make cast iron thermostat housing covers for use on Detroit Diesel's Series 149 diesel engine. PTI Industries was the direct supplier of the thermostat housing covers to Detroit Diesel. When the need for the covers arose, Detroit Diesel would contact PTI Industries who would then contact North Manchester to make the covers. North Manchester would use the pattern to make the covers and then send the covers to PTI for finishing work. PTI would then deliver the completed housing covers to Detroit Diesel.

Although Detroit Diesel owned the pattern, North Manchester retained it to make the thermostat housing covers when requested. Prior to the explosion, PTI Industries contacted North Manchester requesting two modifications to the pattern. North Manchester contracted with Allen Pattern Works, Bloemker's employer, to perform the modifications. Detroit Diesel did not request the modifications and had no knowledge that the modifications were being sought or performed. None of the defendants inspected the pattern before it was delivered to Allen Pattern Works.

The identity of the pattern's original manufacturer is unknown. The designated summary judgment materials establish that the pattern was first placed into the stream of commerce more than ten years before Bloemker's accident, although the exact date is also unknown.

Bloemker filed a two-count complaint against Detroit Diesel, Penske Corporation, PTI Industries, and North Manchester. Count I alleged negligence. Count II alleged that the defendants created and maintained a nuisance. Defendant Penske Corporation was subsequently dismissed from the action, with prejudice, pursuant to Bloemker's motion. The trial court also granted Bloemker's motion to dismiss PTI Industries, with prejudice, over the remaining defendants' objection.

Detroit Diesel and North Manchester each filed a motion for summary judgment, claiming that: 1) the pattern did not constitute a nuisance; 2) the statute of repose contained in Indiana's Product Liability Act (the Act) barred any claim based upon a defect in the pattern; and, 3) they did not owe Bloemker a duty upon which to base a negligence action. In response to the defendants' motions, Bloemker voluntarily dismissed the nuisance action. With respect to the negligence count, Bloemker argued that his claim was not subject to the statute of repose because the claim was not a product liability action, and that each defendant owed him a duty to inspect the pattern and to warn him of the defect in the pattern's core, which duty arose out of the defendants' bailment of the pattern to Bloemker's employer. The trial court granted Detroit Diesel's and North Manchester's motions without stating the theory or theories upon which its judgment was based.

*Bloemker*, 655 N.E.2d at 118–119.

The Indiana Supreme Court granted transfer to consider the case in conjunction with *McGlothlin v. M & U Trucking, Inc.*, 649 N.E.2d 135 (Ind.Ct.App.1995), *trans. granted*, which presented the same issue of whether a supplier of a chattel has a duty of reasonable care to inspect and discover latent as well as patent defects in the chattel. *Bloemker v. Detroit Diesel Corp.*, 687 N.E.2d 358 (Ind.1997). The Supreme Court rejected the latent/patent distinction that would impose no duty to inspect, discover, and warn of latent defects, and stated that the proper consideration was to look to the Restatement (Second) of Torts Sections 388 and 392 to guide the resolution of these issues. *McGlothlin v. M & U Trucking, Inc.*, 688 N.E.2d 1243, 1245 (Ind.1997), *reh'g denied*. For this reason, the Court vacated the trial court's entry of summary judgment in *Bloemker* and remanded the case to the trial court to reconsider the case in light of *McGlothlin*.

On September 1, 1998, North Manchester filed its second Motion for Summary Judgment contending that it owed no duty to Bloemker. On September 4, 1998, Detroit Diesel filed its second Motion for Summary Judgment contending that it owed no duty to Bloemker under either section 388 or section 392 of the Restatement (Second) of Torts. On December 9, 1998, the trial court granted summary judgment in favor of North Manchester and Detroit Diesel. Bloemker now appeals.

## DISCUSSION AND DECISION

### I. *Supplier under §§ 388 & 392*

Initially, we note our standard of review. The purpose of summary judgment is to terminate litigation which can be determined as a matter of law. *Funk v. Funk*, 563 N.E.2d 127, 129 (Ind.Ct.App.1990), *trans. denied*. When reviewing the propriety of the grant of summary judgment, we stand in the same position as the trial court. *Reed v. Luzny*, 627 N.E.2d 1362, 1363 (Ind.Ct.App.1994), *reh'g denied*, *trans. denied*. Summary judgment is only appropriate when the moving party demonstrates that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). Once the movant has sustained this initial burden, the opposing party must respond by designating all parts of pleadings, depositions, answers to interrogatories, admissions, and any other matters on which it relies which demonstrate that a genuine issue exists for trial. *Id.* We consider the facts in the light most favorable to the nonmoving party. *Id.* However, we may sustain the trial court's decision upon any theory supported by the designated materials. T.R. 56(C).

▬ The tort of negligence consists of three elements: 1) a duty owed to the plaintiff by the defendant; 2) a breach of that duty by the defendant; and 3) injury to the plaintiff proximately caused by that breach. *J.A.W. v. Roberts*, 627 N.E.2d

802, 808 (Ind.Ct.App.1994). The first element, the existence of a duty owed to the plaintiff, is usually a question of law for the court's resolution. *Wickey v. Sparks,* 642 N.E.2d 262, 265 (Ind.Ct.App.1994), *trans. denied.* Although summary judgment is rarely appropriate in a negligence action, *Osmulski v. Becze,* 638 N.E.2d 828, 838 (Ind.Ct.App.1994), it may be suitable to determine the legal question of whether a duty exists. *Brewster v. Rankins,* 600 N.E.2d 154, 156 (Ind.Ct.App.1992). Absent a duty, there can be no breach, and thus, no basis for recovery under a negligence theory. *Hawn v. Padgett,* 598 N.E.2d 630, 632 (Ind.Ct.App.1992). Therefore, the threshold issue to be determined in this case is whether Detroit Diesel and North Manchester were "suppliers" of the injury-causing pattern in order to impose a duty under either §§ 388 or 392 of the Restatement (Second) of Torts.

Restatement § 388 provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement § 392 provides:

One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied

(a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or

(b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.

Section 392 differs from section 388 because in addition to the duty to warn, it imposes a duty on the supplier to make a proper inspection of the chattel which would disclose the existence of a defect. Such a duty is imposed on the supplier because the chattel is to be used for the supplier's business purpose. *Bloemker,* 655 N.E.2d at 122.

For the first time, this court addressed the question of whether a duty to inspect exists on the part of a supplier of chattels furnished for the use of another in *McGlothlin v. M & U Trucking, Inc.,* 649 N.E.2d 135 (Ind.Ct.App.1995). There, the plaintiff was injured while he was loading merchandise into a trailer whose landing gear collapsed. The plaintiff sued the owner of the trailer and the company who leased the trailer to the plaintiff's employer. Both defendants routinely inspected the trailer as required by a railroad membership agreement between them and by industry standards. *Id.*

We articulated the question in *McGlothlin* as whether, assuming a latent defect existed in the landing gear, the defendants had a duty to discover such a latent defect. *Id.* at 139. In determining that no such duty existed as a matter of law, we relied upon *Stump v. Indiana Equipment Co.,* 601 N.E.2d 398 (Ind.Ct.App.1992), which acknowledged that while there is a duty to inspect and discover patent defects in used equipment, there is no duty to discover "'latent defects which by their very nature could not be discovered by a reasonable

and customary inspection.'" *McGlothlin,* 649 N.E.2d at 139 (quoting *Stump,* 601 N.E.2d at 406). We concluded that "it would be inconsistent with Indiana law and public policy to hold that [the defendants] had a duty to discover latent defects in the trailer landing gear that would not have been revealed by a reasonable and customary inspection." *McGlothlin,* 649 N.E.2d at 139–40.

Both *McGlothlin* and *Stump* defined the scope of the duty owed in terms of the facts and circumstances surrounding the inspection, including the nature of the defect. If the defect is patent, there is a duty to inspect, discover and warn of that defect. If, the defect is latent, however, there is no duty to discover such defects, *Stump,* 601 N.E.2d at 406, and consequently, no duty to inspect for such defects. *McGlothlin,* 649 N.E.2d at 139–40.

However, shortly after *McGlothlin,* we were again faced with this issue in *Bloemker,* 655 N.E.2d 117, in which this court criticized the rationale of *McGlothlin,* disagreeing with the *McGlothlin* latent/patent distinction.

> Defining the duty owed in terms of the nature of the defect overlooks the distinction between the existence of a duty and the breach of that duty. The duty would appear to be one of inspection in the first instance because there is no way of knowing the nature of the defect as latent or patent without inspection. The nature of the defect becomes relevant only when determining whether the duty to inspect was breached. Breach of the duty would arise where a supplier of a chattel fails, upon reasonable inspection, to discover a patent defect. Where a latent defect exists, there would be no breach for failing to discover the defect so long as a reasonable inspection was performed.

*Id.* at 123.

Upon transfer of *McGlothlin* and *Bloemker,* our supreme court rejected the latent/patent distinction which determined the duty to inspect from a supplier's

knowledge of possible defects or their reasonable probability, and found that this conclusion "is inconsistent with the broader evaluation as to the duty that we now require." *McGlothlin v. M & U Trucking, Inc.,* 688 N.E.2d 1243, 1245 (Ind.1997). *Accord Bloemker v. Detroit Diesel Corp.,* 687 N.E.2d 358, 359 (Ind.1997). Instead, in both cases, our supreme court held that when the alleged negligence is the supplying of a defective chattel that causes injury, the proper guide to resolve these issues is the Restatement (Second) of Torts Sections 388 and 392. *McGlothlin,* 688 N.E.2d at 1245; *Bloemker,* 687 N.E.2d at 359.

Thus, our supreme court has recognized sections 388 and 392 as the appropriate guide to determine whether a duty exists when a person is injured by a supplier's chattel. Before we can determine whether North Manchester or Detroit Diesel breached a duty of reasonable care with respect to Bloemker, we must first determine whether North Manchester or Detroit Diesel is a supplier under either section 388 or 392.

### A. *Detroit Diesel*

▮ Bloemker argues that Detroit Diesel, as the owner of the pattern, is a supplier under either § 388 or § 392. Specifically, Bloemker claims that Detroit Diesel, as the owner, controlled who could use the pattern and allowed others to use/alter the pattern while North Manchester stored it. Essentially, Bloemker claims that an owner is equivalent to a supplier with respect to §§ 388 and 392. Further, Bloemker cites to comment c of § 388 for the proposition that Detroit Diesel is a supplier. Pursuant to comment c, persons included as suppliers includes:

> any person who for any purpose or in any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is

supplied or for which it is permitted to be used.

Restatement (Second) of Torts § 388 cmt. c.

Bloemker argues that this definition, although included in the comments to § 388, applies to § 392 as well. Bloemker claims that by definition, Detroit Diesel is a supplier because it had control over the pattern, power to exercise and direct authority over the pattern, and power to determine who could use the pattern. Bloemker relies on the facts of the case for the argument that even though Detroit Diesel may not have had physical possession of the pattern, Detroit Diesel had control of the pattern as the owner, and therefore is a supplier.

Although Detroit Diesel allowed North Manchester to store the pattern, Detroit Diesel chose PTI to supply finished thermostat covers as part of its engine, thereby authorizing PTI and PTI's suppliers, including North Manchester, to use the pattern to manufacture the housing covers. Therefore, Bloemker contends that by granting PTI and third parties physical possession over the pattern in order to manufacture housing covers for its business purpose, Detroit Diesel remained in overall control of the pattern, as the owner, and is thereby a supplier. Bloemker relies on *McGlothlin v. M & U Trucking, Inc.*, 688 N.E.2d 1243 (Ind.1997); *Fischer v. Red Lion Inns Operating L.P.*, 972 F.2d 906 (8th Cir.1992); and *Gall v. McDonald Industries*, 84 Wash.App. 194, 926 P.2d 934 (1996), *review denied*, for the proposition that comment c of § 388 includes in its scope of who is a supplier, anyone in possession or control of a chattel that supplies it to another. Thus, Detroit Diesel as the owner of the pattern with overall control of who uses the pattern, is a supplier.

On the other hand, Detroit Diesel argues that it is not a supplier under either § 388 or § 392 because technical ownership does not rise to the level of a supplier. Detroit Diesel relies on the affidavit of Francis W. Morton (Morton), a senior buyer in the cast products group at Detroit Diesel, to support Detroit Diesel's motion for summary judgment. Morton's affidavit establishes the customary industry procedure for obtaining parts such as the housing cover in this case.

1. Detroit Diesel designs the housing cover and prepares a blueprint of the part;

2. The blueprint is sent for bids to various machine shops [PTI], and a machine shop is selected to produce the finished part;

3. Detroit Diesel issues a purchase order to the machine shop to acquire the pattern;

4. The machine shop locates a foundry [North Manchester] to cast the part;

5. The foundry sends the print to a pattern maker [Allen] to have a pattern made from which parts can be cast;

6. The pattern maker uses dimensions from the blueprint and other industry information to make the pattern;

7. The pattern maker delivers the completed pattern to the foundry;

8. The foundry [North Manchester] stores the pattern and uses it to cast parts as required;

9. The cast parts are sent from the foundry to the machine shop [PTI] for finishing; and

10. The finished parts are delivered from the machine shop to Detroit Diesel.

(R. 658–659). Morton's affidavit also states that no records exist at Detroit Diesel to identify the initial machine shop, foundry or pattern maker involved with the housing cover in this case. Detroit Diesel only contracted with PTI to produce finished, machined housing covers, and had no agreement with North Manchester, Allen, or Bloemker. Further, Detroit Diesel was not involved in the selection of the

pattern maker for the pattern and Detroit Diesel did not store or ever possess the pattern. Also, Detroit Diesel was not involved in the manufacture, construction or design of the pattern. Finally, Morton stated that Detroit Diesel did not instruct the machine shop (PTI), the foundry (North Manchester), the pattern shop (Allen), or Bloemker regarding how to make the modifications to the pattern. In fact, Morton claims that Detroit Diesel did not even request the modifications to be made to the pattern; PTI made the request to make machining easier, and the modification did not affect the finished part or confer any benefit upon Detroit Diesel.

Detroit Diesel relies on several cases to argue that a technical owner of a chattel such as Detroit Diesel, without more, is not a supplier for purposes of §§ 388 and 392. In *White v. Chrysler*, the Michigan Supreme Court found that an automobile manufacturer was not liable under a "supplier of a chattel for its business purpose" theory. 421 Mich. 192, 364 N.W.2d 619 (Mich.1984). In that case, the automobile manufacturer entered into a contract with the manufacturer of the component part that contemplated the component manufacturer would have a die set made to produce the part according to the specifications of the contract. However, although the die set was manufactured by or at the direction of the component manufacturer, the automobile manufacturer retained title to the die set casts as contemplated by the terms of the contract. Further, the automobile manufacturer did not physically transfer or entrust the die sets to the component manufacturer because the contract contemplated that the component manufacturer was required to produce the component parts from the die sets. Finally, the automobile manufacturer did not supply the die sets directly or through a third person. Thus, the court in that case decided that no liability existed because to find liability would result in the improper precedent that whenever a contract is entered into contemplating the use of chattels to produce a part or service, the em-

ployer of the contractor would be deemed to have supplied the implement. *Id.* at 201–202, 364 N.W.2d at 623.

In another case cited by Detroit Diesel, the 10th Circuit Court held that the United States Government was not a supplier within the meaning of the Restatement doctrine, of a mold that exploded and killed an employee of an independent contractor working for the United States. *United States v. Page*, 350 F.2d 28 (10th Cir.1965), *cert. denied*. In that case, the contract provided that the government would supply certain equipment and supplies and the contractor would supply personnel, facilities, and certain materials and supplies. The court found that the government was not a supplier because although it owned the molds, this ownership was technical in the sense that the government never had possession nor exercised control over the molds. *Id.* at 32. Thus, that court did not equate ownership with supplier status because the government never had possession nor control over the chattel. *Id.* at 33.

Detroit Diesel also cites the case of *Dooley v. Parker–Hannifin Corporation*, 817 F.Supp. 245 (D.R.I.1993) affirmed at 7 F.3d 218 (1st Cir.1993), for the proposition that owners are not necessarily suppliers. In that case, a company's employee was injured while using a die owned by, but which was never in possession, of the company's customer. The court rejected the employee's liability claim against the die owner and held that because Parker–Hannifin (the die owner) did not design, manufacture, or ever possess the die and was not involved with the manner in which it was maintained and used, there was no connection between the die owner's conduct and Dooley's injury. *Id.* at 247.

Detroit Diesel also distinguishes *Fischer* and *Gall* as unsupportive of Bloemker's argument that these cases decide the issue of whether the owner of a chattel is a supplier. In *Fischer*, the defendant did own the machines that caused the injury;

however, the defendant also installed, maintained, stocked, and operated these same machines. Thus, Detroit Diesel argues that ownership in that case was immaterial. In *Gall,* the defendant was a lessor of a truck that caused injury to the plaintiff when the brakes failed. However, the defendant was more than a technical owner; the defendant directly supplied the leased truck to the plaintiff's employer.

Therefore, because we find that Detroit Diesel is merely a technical owner of the pattern, and never possessed nor maintained control over the pattern, Detroit Diesel cannot be classified as a supplier under either § 388 or § 392.

### B. *North Manchester*

Next, Bloemker argues that North Manchester is also a supplier under either § 388 or § 392. Specifically, Bloemker claims that North Manchester is liable, relying on the same argument used for Detroit Diesel; that North Manchester was in control of the pattern when it was supplied to Allen and anyone in control of the chattel that supplies it to another is a supplier under § 388 and § 392.

Bloemker argues that pursuant to customary practices, North Manchester stored Detroit Diesel's pattern in order for North Manchester to produce the castings from the pattern when machine shops such as PTI placed an order. North Manchester obtained control of the pattern when it contracted with PTI for PTI to manufacture castings of the unfinished thermostat housing covers. However, PTI needed the pattern to be modified to ease its manufacturing process. Bloemker also argues that North Manchester had the authority to determine who would make the modifications PTI needed for the pattern. Therefore, North Manchester supplied the pattern to Allen to make the modifications in order for North Manchester to manufacture the castings for PTI, that in turn completed the thermostat covers for Detroit Diesel. Thus, Bloemker argues that North Manchester is not absolved of liability simply because it did not own the pattern, and instead, North Manchester is a supplier because it stored the pattern, and thereby had control over the pattern when it supplied the pattern to Allen in order for it to modify the pattern.

However, § 388 and § 392 contemplate supplier status for those parties that supply a dangerous chattel for the use for which it is supplied. The evidence reveals that North Manchester merely stored and used the pattern to prepare castings for machine shops such as PTI. North Manchester did not make the pattern and had no knowledge how the pattern was made. Furthermore, North Manchester does not modify patterns, but instead, it merely uses the pattern to make castings for machine shops. Additionally, the evidence reveals that North Manchester never directed or controlled the method of modification used by Allen and Bloemker; instead, Allen and Bloemker decided to modify the pattern in a manner that eventually caused Bloemker's injury. Finally, PTI supplied the pattern to Allen in order for the pattern to be modified in order to ease PTI's manufacturing process, for the sole benefit of PTI. North Manchester did not supply the pattern to Allen. North Manchester is a foundry in the business of preparing castings from the pattern and is not involved in any facet of modifying patterns. The pattern was intended to be used by North Manchester to prepare castings, not to be modified.

Therefore, because we find that North Manchester merely stored and used the pattern in order to prepare castings and Allen used the pattern to complete a modification to the pattern for PTI's benefit, North Manchester cannot be classified as a supplier under either § 388 or § 392.

### CONCLUSION

We find that the evidence most favorable to Bloemker, as the nonmoving party, reveals that neither Detroit Diesel nor North Manchester can be classified as suppliers under either § 388 or § 392 of the

Restatement (Second) of Torts. Because Detroit Diesel is merely a technical owner and North Manchester merely stored and used the pattern, neither Detroit Diesel nor North Manchester can be held liable under § 388 or § 392. Therefore, we find that the trial court properly granted summary judgment in favor of Detroit Diesel and North Manchester because the evidence reveals that the threshold issue of whether Detroit Diesel and North Manchester can be classified as suppliers has not been satisfied from the facts and circumstances of this case.

Affirmed.

ROBB, J., and FRIEDLANDER, J., concur.